In the Supreme Court of Georgia

Decided: November 17, 2014

S14A1168.  MACK v. THE STATE.

HUNSTEIN, Justice.

Appellant Artenimus Rayshun Mack has been charged with murder and related offenses in connection with an October 2012 shooting in Baldwin County.  In the course of his prosecution, Mack moved to suppress various statements he made to police investigators following his arrest, contending, inter alia, that they were obtained in violation of his constitutional privilege against self-incrimination.  Following a hearing, at which the State adduced video recordings of Mack's statements and the testimony of investigators to whom these statements were made, the trial court denied the motion.  The trial court concluded, in pertinent part, that Mack had not unequivocally invoked his right to remain silent and that he had "purposefully reinitiated" the communications with investigators in which he ultimately confessed to shooting the victim.  We granted Mack's application for interlocutory appeal, and we now conclude that

these findings were in error.  Accordingly, we reverse.

On November 1, 2012, Mack was arrested and taken to the Baldwin County Sheriff's Office.  At approximately 12:10 p.m., after an officer advised him of his Miranda[1] rights, Mack executed a written waiver form, and investigators began questioning him.  During the approximately two hours that followed, Mack told investigators his version of the events leading up to and culminating in the shooting.  Mack admitted being present but maintained that the shooter was an unidentified third party who, in the course of purchasing marijuana from Mack and the victim, unexpectedly produced a gun and fired at the victim.

After a one-and-a-half-hour break, the interview resumed, wherein the investigators performed a gunshot residue test on Mack.  The investigators then told Mack he needed to start over with his story.  Mack continued to deny that he had shot the victim, insisting that his prior account was the truth.

When the investigators began confronting Mack with inconsistencies between his account and the forensic evidence, the discussion became heated,

---

[1]Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

and Mack began asking about what charges he was facing. When the lead investigator, Lieutenant Bobby Langford, told Mack that he would likely be charged with drug possession due to a large quantity of marijuana found in Mack's car, the following colloquy ensued:

> Mack: OK, well, you're going to charge me with that dope, then charge me with the dope and go ahead send me to the jail.
>
> Langford: I'm going to.
>
> Mack: OK, well, let's ride.
>
> Langford: Well, let's get –
>
> Mack: I'm done. I have no more to say. I'm done. (Standing up) Let's ride.

At this point, the investigators told Mack to sit back down, to which he replied, "I'm done. I ain't got no more to say." Mack sat back down, and this exchange followed:

> Langford: We still got some things we need to clear up. That's what I'm trying to –
>
> Mack: I have no more to say. Y'all going to sit here and just tell me my story is a lie –
>
> Langford: That's what you're doing –
>
> Mack: I have no more to say. You're going to charge me, man,

3

charge me. Take me in. Let's rock. I'm ready to go.

Langford: You ain't got to talk back to me.

The interview continued for approximately 30 more minutes, with Mack insisting on the truth of his account. Toward the end of the interview, Mack expressed his desire to return to the jail. Before turning Mack over to other law enforcement personnel, Langford tried several times, with different tactics, to convince Mack to tell him the truth and admit his "mistake." Langford also informed Mack that he was leaving town the next morning and that as a result this would likely be Mack's last opportunity to tell Langford what really happened. Mack still refused to change his story, and the interview ended at approximately 5:10 p.m.

The following morning, Langford interviewed Mack at the Baldwin County Sheriff's Office again, beginning at approximately 10:10 a.m. As reflected in the video recording, the interview began with Langford explaining that he was preparing to leave town and wanted to find out whether Mack, after having "a chance to sleep on everything last night," desired to "get anything

4

straight this morning."[2] Langford then read Mack his <u>Miranda</u> rights, and Mack signed another waiver form. Langford resumed his entreaties to Mack to tell him the truth and again announced that he was preparing to leave town. Mack continued to deny committing the murder. Several breaks were taken, during which Mack was permitted to smoke, telephone his wife, and return to his room to pray. After returning from his prayers, Mack altered his story slightly in a way that made it more consistent with the forensic evidence as described to him by Langford, but he still refused to admit to shooting the victim. Langford, clearly frustrated, ended the interview and escorted Mack out of the interrogation room at approximately 11:54 a.m.

The final interview began roughly ten minutes later, wherein Mack, after being Mirandized one more time, admitted to Langford that he shot the victim and gave a brief description of the events leading up to the murder. The video recording contains no colloquy about, or other indication of, who initiated this

---

[2]Early on in this interview, Mack told Langford that he had asked jail personnel to contact Langford for the purpose of requesting to be moved out of isolation, but that he had been rebuffed. It is clear from the video, as confirmed by Langford's testimony at the suppression hearing, that Langford was not informed of Mack's request until Mack himself brought the issue to Langford's attention after the interview began.

conversation. At the suppression hearing, however, Langford testified that Mack initiated the conversation: "Somebody from the detention called me or came up and said, '[Mack] wants to speak with you again,' and I said, 'bring him up.'" There was no testimony or other evidence adduced at the suppression hearing to dispute this account.

In reviewing a trial court's ruling on a motion to suppress, this Court must affirm the trial court's findings on disputed facts unless clearly erroneous. McDougal v. State, 277 Ga. 493 (1) (591 SE2d 788) (2004). Here, however, there are no disputed facts, given that Mack's interrogation sessions were captured in video recordings that are part of the appellate record and that the one material communication that was not recorded – the request prompting Mack's final interview – is not the subject of any factual dispute. See id.; Green v. State, 275 Ga. 569, 573, n.11 (2) (570 SE2d 207) (2002). Accordingly, our review of the trial court's application of the law to the undisputed facts is de novo. McDougal, 277 Ga. at 497.

1. In examining the operation of the Fifth Amendment's privilege against self-incrimination, the United States Supreme Court has made clear that when an individual in custody "indicates in any manner, at any time prior to or during

6

questioning, that he wishes to remain silent, the interrogation must cease."

Miranda v. Arizona, 384 U. S. 436, 473-474 (III) (86 SCt 1602, 16 LE2d 694) (1966). At this point, that individual "has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion." Id. at 474. In this regard, this Court has held that

> an assertion of the right to remain silent during custodial interrogation must be unambiguous and unequivocal before interrogators are required to stop their questioning. . . . Resolution of that question depends on whether the accused articulated a desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.

(Citations and punctuation omitted.) Rogers v. State, 290 Ga. 401, 404 (2) (721 SE2d 864) (2012). An accused will be found to have "unambiguously and unequivocally" asserted his right to remain silent where he declares that he is finished talking or otherwise expresses the clear desire for police questioning to cease. See, e.g., State v. Moon, 285 Ga. 55, 57 (673 SE2d 255) (2009) (finding unequivocal assertion of the right to remain silent where defendant, after being questioned for some time, stated, "I ain't got no more to say. I mean, that is it."); Green, 275 Ga. at 572-573 (finding unequivocal assertion of right

7

to silence when defendant said in response to detective's suggestion that the interview was about to end, "That's cool. . . . I don't want to talk."); Hatcher v. State, 259 Ga. 274, 277 (2) (379 SE2d 775) (1989) (finding unequivocal assertion where defendant stated during police interview, "I don't want to talk about it no more please. No, no, no."), overruled on other grounds by Perez v. State, 283 Ga. 196, 200 (657 SE2d 846) (2008). Cf. Barnes v. State, 287 Ga. 423, 425 (2) (696 SE2d 629) (2010) (defendant's statement that "if you're not going to talk real talk, then we shouldn't talk" was not an unequivocal assertion of the right to remain silent).

Here, Mack unambiguously and unequivocally invoked his right to remain silent when he stated during the November 1 interview, "I'm done. I have no more to say. I'm done. Let's ride."[3] These statements, followed closely by similar expressions of Mack's desire to stop talking amidst the investigators' entreaties to him to tell the truth, clearly articulated Mack's desire that further questioning cease. See Moon, 285 Ga. at 57. Accordingly, any statements Mack made during the November 1 interview after invoking his right to remain

_____

[3]As reflected on the video recording of the November 1 interview, Mack made this statement at approximately 4:34 p.m.

8

silent were improperly obtained and must be suppressed. See id. (affirming suppression of statements made after defendant's invocation of right to remain silent); Green, 275 Ga. at 573 (trial court should have suppressed statements made after invocation of defendant's right to remain silent).

2. The admissibility of the statements made during the November 2 interviews is a more complicated issue, as it is clear that an accused's assertion of his right to remain silent effects neither a "permanent immunity from further interrogation" by the police nor a "blanket prohibition" on later statements made voluntarily by the accused. Michigan v. Mosley, 423 U. S. 96, 102 (96 SCt 321, 46 LE2d 313) (1975). Rather, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether 'his right to cut off questioning' was 'scrupulously honored'" by law enforcement authorities. Id. at 104; accord Griffin v. State, 280 Ga. 683 (2) (631 SE2d 671) (2006); Fields v. State, 266 Ga. 241 (1) (466 SE2d 202) (1996).

The determination as to whether the police have scrupulously honored the defendant's right to remain silent rests in part upon their immediate response to the defendant's invocation of the right; a showing of respect for the defendant's right, by immediately ceasing questioning upon its invocation, is a significant

factor in this analysis. See Mosley, 423 U. S. at 105-106 (right to remain silent was scrupulously honored where, inter alia, police "immediately ceased the interrogation" upon defendant's invocation of right); Griffin, 280 Ga. at 686 (right was scrupulously honored where, upon invocation of the right, police "immediately stopp[ed] [the] interview and physically exit[ed] the interview room"); Fields, 266 Ga. at 243 (right was scrupulously honored where "police immediately ceased all questioning when [defendant] exercised his right to remain silent").

Another factor in determining whether subsequent questioning is permissible is the interval of time separating the accused's invocation of his right from the subsequent police-initiated questioning. Mosley, 423 U. S. at 106 (citing "the passage of a significant period of time" as a factor in finding subsequent police interrogation permissible); accord Hatcher, 259 Ga. at 277. Though we have never established a bright line for what constitutes the requisite time interval in this regard, we have previously held in circumstances similar to those presented here that a 17-hour overnight time lapse between assertion of the privilege and further police communications was not sufficient. Wilson v. State, 275 Ga. 53 (2) (562 SE2d 164) (2002). In Wilson, the defendant's initial

10

statements had been suppressed because they were taken after he had invoked his right to remain silent, and we held that, under those circumstances, the mere lapse of overnight hours was not sufficient to justify further police-initiated interrogation. 275 Ga. at 57-58. Cf. Griffin, 280 Ga. at 686 (police-initiated interrogation permissible where conducted four days after accused cut off questioning); Fields, 266 Ga. at 243 (police-initiated interrogation permissible where conducted ten months after accused cut off questioning).

Where a defendant's right to remain silent has not been scrupulously honored, a statement by the defendant will be deemed properly obtained only if the defendant himself initiates the communications with law enforcement authorities. See Stewart v. State, 286 Ga. 669 (4) (a) (690 SE2d 811) (2010) (defendant's statement properly obtained where he initiated communications after invoking his right to silence); Morgan v. State, 275 Ga. 222 (4) (564 SE2d 192) (2002) (same); Wilson, 275 Ga. at 58-59 (same); Larry v. State, 266 Ga. 284 (2) (a) (466 SE2d 850) (1996) (same). If, after invoking his Fifth Amendment rights, a defendant is found to have initiated contact with authorities and then knowingly and intelligently waived his rights, his ensuing statements will be considered properly obtained. Oregon v. Bradshaw, 462 U.S.

11

1039, 1045 (103 SCt 2830, 77 LE2d 405) (1983) (plurality opinion); McDougal, 277 Ga. at 500-501.

Applying these principles to the two interviews of November 2, we conclude that Mack's statements in both interviews were improperly obtained.

(a) The initial interview of the day was clearly initiated by Langford, who summoned Mack to find out whether he desired to "get anything straight this morning."[4] This resumption of questioning took place just 17 hours after Mack's original invocation of the right to remain silent on the previous day, which had been met with only continued questioning and pleas to tell the truth. See Wilson, 275 Ga. at 58 (police-initiated interrogation would not be justified 17 hours after defendant's initial invocation of right to silence was violated by police). Cf. Griffin, 280 Ga. at 686 (subsequent interrogation initiated by police permissible, where investigator had "scrupulously honored [the defendant's] original invocation of his right to remain silent by immediately stopping his interview and physically exiting the interview room"); Fields, 266 Ga. at 243

---

[4]The fact that Mack had apparently attempted to get jail personnel to summon Langford during the night after the November 1 interview to discuss being held in isolation does not change this conclusion, given that this request was not made known to Langford until after he had initiated communications with Mack on the morning of November 2.

(subsequent interrogation initiated by police permissible, where police had "immediately ceased all questioning when [the defendant] exercised his right to remain silent"). Given investigators' disregard of Mack's right when initially invoked on November 1 and the relatively short interval between that time and the resumption of questioning the next day, the interview initiated by Langford on the morning of November 2 was improper, and all statements made by Mack therein are inadmissible.

(b) The admissibility of the second interview on November 2, in which Mack finally confessed to the murder, turns on whether this interview was "initiated" by Mack. Though numerous cases in this Court have been resolved on the basis that the defendant, after previously invoking his right to remain silent, himself voluntarily initiated contact with authorities, see, e.g., Stewart, 286 Ga. at 671-672; Morgan, 275 Ga. at 224; Wilson, 275 Ga. at 58; Larry, 266 Ga. at 286, this case compels us to examine in depth what constitutes an "initiation" of communications by a defendant following the violation by authorities of the defendant's previously invoked rights.

The "initiation" concept arose from the United States Supreme Court's decision in Edwards v. Arizona, 451 U. S. 477 (II) (101 SCt 1880, 68 LE2d 378)

13

(1981), which established that, once an accused has invoked his Fifth Amendment right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*." (Emphasis added.) Id. at 484-485.[5] The Court has since described the initiation concept as "a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers." Bradshaw, 462 U. S. at 1044 (plurality). In examining the concept of "initiation" under Edwards, the Bradshaw Court's plurality distinguished between inquiries "relating to routine

---

[5]Edwards was a right to counsel case, not a right to silence case. We have previously made clear that right to silence cases are generally guided by Mosley, and not Edwards, see, e.g., Morgan, 275 Ga. at 223-224; Bright v. State, 251 Ga. 440 (2) (306 SE2d 293) (1983). Taken out of context, the language in these cases might be construed to mean that the Edwards line of authority is inapplicable *for all purposes* in right to silence cases. This is not so. Edwards does not apply in right to silence cases insofar as it bars all police-initiated interrogation following a suspect's invocation of his right to counsel; in right to silence cases, Mosley provides the rule that such police-initiated interrogation may be permissible where the suspect's rights have been scrupulously honored. See Wayne R. LaFave, 2 Crim. Proc. § 6.9 (f) (3d ed. 2013) (distinguishing between per se proscription of Edwards and case-by-case proscription of Mosley). However, where the issue is the effectiveness of a suspect's purported initiation of renewed contact, rather than the propriety of interrogation clearly instigated by police, we see no reason why the definition of "initiation" should be any different in right to silence cases than it is in right to counsel cases. We therefore view the Edwards line of authority as fully applicable here in defining the contours of a defendant's post-invocation "initiation" of contact with police.

incidents of the custodial relationship," such as a request for a drink of water, and those "represent[ing] a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." 462 U. S. at 1045.[6] Thus, "initiation" requires not only that the defendant speak up first but also that his words reflect a desire to discuss the investigation at hand. Id. See also McDougal, 277 Ga. at 500 (holding defendant's post-invocation statement inadmissible despite fact that defendant had summoned detective to his holding cell, because there was no evidence defendant's intent was to discuss the investigation rather than some other issue related to his confinement).

Even if a defendant does speak up first after having previously invoked his Fifth Amendment rights, and even if his words do evince a desire to discuss the investigation, these facts alone do not suffice to constitute an "initiation" of contact for Edwards purposes. In at least one case, this Court has declined to find an "initiation" despite the bare fact that the defendant spoke up first to inquire about the charges against him. Ashley v. State, 261 Ga. 488 (1) (405 SE2d 657) (1991). In Ashley, the defendant invoked his right to counsel and

---

[6]See also id. at 1055 (Marshall, J., dissenting) ("in order to constitute 'initiation' under Edwards, an accused's inquiry must demonstrate a desire to discuss the subject matter of the criminal investigation").

the interrogating officers exited the interview room; a new officer, allegedly unaware of the invocation of rights, subsequently entered the room with the intent to interrogate; and, upon this officer's entry, the defendant immediately asked about the charges he was facing.  Id. at 488-489.  Concluding that no "initiation" had occurred, we opined that

> [t]o hold otherwise, would cause request[s] for counsel to be meaningless.  The police could cease the interrogation, leave the room, re-enter with the intent of further interrogation, and hope that the accused speaks first.  Such a rule would do nothing to safeguard the right of an accused to be free from uncounseled interrogation.

(Quotation marks omitted.)  Id. at 489.  Cf. Haynes v. State, 269 Ga. 181 (4) (496 SE2d 721) (1998) (defendant did voluntarily initiate contact where, after he invoked his right to counsel and officers left the room, another officer entered room unaware of defendant's presence and defendant volunteered that previous statement was false).  Thus, we have recognized that substance trumps form in determining whether the entire sequence of events indicates a defendant's voluntary initiation of renewed contact.  See Patterson v. State, 274 Ga. 713, 715 (1) (559 SE2d 472) (2002) (holding that final interview in which defendant confessed was "no more than a pretense" to create impression that defendant had

16

initiated renewed contact after previous improper interrogation). Accordingly, there is more to the analysis than merely an inquiry into "who said what when," and we must consider the context in which a purported "initiation" by the defendant was made before declaring it effective to allow the resumption of police interrogation.

This principle has been followed by courts from several other jurisdictions that have examined the "initiation" issue in depth. The consensus among these authorities is that, where law enforcement officers have disregarded a suspect's previously-invoked rights by continuing to interrogate him, a renewal of contact by the defendant will be considered an "initiation" only if the decision to renew contact was not a "response to" or "product of" the prior unlawful interrogation. See, e.g., Collazo v. Estelle, 940 F2d 411, 423 (9th Cir. 1991) (a valid "initiation" by defendant must stem from an "unbadgered desire" to engage with authorities and cannot be the "delayed product" of authorities' unlawful conduct); State v. Yoh, 910 A2d 853, 861 (Vt. 2006) (defendant's statement admissible only if his "decision to initiate the third interview was voluntary, and not the product of the coercion that took place in the tainted second interview");

Blake v. State, 849 A2d 410, 422 (Md. 2004) (where accused's inquiry "was in direct response to . . . unlawful interrogation," the accused did not "initiate" renewed contacts with police and thus his statement was inadmissible); People v. Kinnard, 470 NYS2d 828, 830 (N.Y. App. Div. 1983) (framing the question as "whether the police's earlier infringement of defendant's right to remain silent . . . , even though unavailing at the time, fatally tainted the spontaneity of his subsequent statement, making it instead the product of inducement, provocation or subtle coercion"); see also United States v. Gomez, 927 F2d 1530 (III) (11th Cir. 1991) (where only a few minutes had elapsed between unlawful interrogation and the defendant's renewed contact with a different officer, such contact did not constitute "initiation" under Edwards); People v. Boyer, 768 P2d 610, 625 (Cal. 1989) (despite fact that defendant summoned detective back to interrogation room and confessed, refusing to find defendant had "initiated" the communication because such initiation was preceded by a series of violations of defendant's previously invoked right to silence and right to counsel), disapproved on other grounds by People v. Stansbury, 889 P2d 588, 591 n.1 (Cal. 1995); Perrine v. State, 919 So2d 520, 524 (Fla. Ct. App. 2005)

(analyzing validity of defendant's initiation of renewed contact by examining whether the "tainted post-<u>Miranda</u> interrogation had been dissipated"). See also generally <u>Maryland v. Shatzer</u>, 559 U. S. 98, 107 (II) (130 SCt 1213, 175 LE2d 1045) (2010) (in analyzing admissibility of statement made by accused after his invocation of rights, framing inquiry as whether accused's "change of heart" was brought on by his own "further deliberation" as opposed to police coercion).

Accordingly, we now expressly adopt this rule: a suspect will be considered to have "initiated" renewed contact with law enforcement authorities, so as to permit further interrogation, only if the renewed contact by the suspect was not the product of past police interrogation conducted in violation of the suspect's previously-invoked rights. In determining the causal connection between the prior unlawful interrogation and the suspect's renewal of contact, the entire sequence of events leading up to the suspect's renewal of contact must be considered, including but not limited to the lapse of time between the unlawful interrogation and the renewed contact, any change in location or in the identity of the officers involved from one interview to the next, and any break

19

in custody between interviews. See, e.g., <u>Collazo</u>, 940 F2d at 421; <u>Yoh</u>, 910 A2d at 862; <u>Blake</u>, 849 A2d at 422; <u>Perrine</u>, 919 So2d at 524-525. The State bears the burden of proving an effective "initiation" under the circumstances. See <u>Blake</u>, 849 A2d at 418; <u>State v. Munson</u>, 594 NW2d 128, 141 (Minn. 1999).

On appeal, the reviewing court must accept the trial court's findings of disputed fact regarding "initiation" unless clearly erroneous. See, e.g., <u>Walton v. State</u>, 267 Ga. 713 (3) (482 SE2d 330) (1997) (determination that defendant rather than officers actually initiated further conversation reviewed under clearly erroneous standard); <u>Guimond v. State</u>, 259 Ga. 752 (2) (386 SE2d 158) (1989) (same). However, the court must review de novo the determination of whether the facts so found constitute an effective "initiation" in the legal sense. See <u>Smith v. State</u>, 275 Ga. 715 (4) (571 SE2d 740) (2002) (on mixed questions of fact and law, appellate court independently applies applicable legal principles to facts). In other words, the appellate court must affirm the trial court's findings on "who said what when" unless they are clearly erroneous, but must independently review whether any actual renewal of contact by the suspect, in the context of the entire interaction between law enforcement authorities and the

20

accused, constitutes a legally effective "initiation" under the principles set forth above.[7]

Applying the above principles, we hold that the State has failed to satisfy its burden to establish an effective "initiation" by Mack. While the undisputed evidence confirms the trial court's finding, as a matter of historical fact, that Mack initiated the final contact with Langford by summoning him through sheriff's office personnel, this conduct did not constitute an "initiation" of contact in the legal sense. There was no break in custody, a very short lapse in time, and no change in location or identity of the interrogating officer from the first interview on November 2 to the second. See Collazo, 940 F2d at 421-422

_____

[7]Though most of our prior cases either explicitly or implicitly have utilized a clearly erroneous standard regarding initiation, see e.g., Harvell v. State, 275 Ga. 129 (2) (562 SE2d 180) (2002); Walton, 267 Ga. at 717, this is likely because these cases focused primarily on the "historical fact" of initiation, i.e., the "who said what when." In the one case where we found that a defendant's actual initiation did not operate as an initiation in the legal sense, though we did not discuss the standard of review, we utilized the de novo standard without expressly acknowledging it. Ashley, 261 Ga. at 489 (reversing finding that defendant initiated contact even though there was no dispute that he had spoken first). Given the nature of the initiation inquiry, we think the de novo standard of review is clearly the correct one. See Collazo, 940 F2d at 421 (conducting "plenary review" of initiation and waiver issues). But see Blake, 849 A2d at 422 (noting split among courts as to proper standard of review); Gomez, 927 F2d at 1539, n.9 (purporting to utilize clearly erroneous standard but nonetheless reversing, reasoning that under the circumstances "an Edwards type of initiation was not possible").

21

("[t]he day, subject matter, place of the interrogation, and interrogation team remained the same"). Mack's request to speak with Langford was made just minutes[8] after the cessation of more than one-and-a-half hours of police questioning, conducted in violation of Mack's previously invoked right to remain silent, during which Langford repeatedly implored, badgered, and cajoled Mack to tell the truth. See Blake, 849 A2d at 422-423 (no "initiation" in the legal sense where just 28 minutes elapsed between officer's improper interrogation and defendant's expression of desire to talk); Gomez, 927 F2d at 1539, n.8 (opining that a few minutes was not sufficient time to "overcome the coercion" of an unlawful interrogation and render possible a defendant's "initiation" of contact under Edwards). That unlawful interview followed the

---

[8]Precisely how many minutes is unclear, but the time stamps on the video recordings reflect between nine and ten minutes from Langford's ushering Mack out of the first interview to the beginning of the footage of the second interview. In addition, Mack testified at the Jackson-Denno hearing that outside the interview room while waiting for the jailers after the first interview, Langford continued his pitch to Mack to tell the truth, which would further condense the time frame from improper interrogation to "initiation."

This close temporal proximity, along with the multiple improper interrogation sessions, distinguishes this case from Wilson, supra, in which this Court held that the defendant had effectively initiated renewed contact with police after a violation of his previously-invoked right to silence. 275 Ga. at 58. We decline to speculate, however, whether the result in Wilson would still obtain under the rule set forth herein.

interrogation of the previous day, in which Langford had also blatantly ignored Mack's invocation of his Fifth Amendment privilege. We thus conclude that Mack's request to speak with Langford was the product of improper interrogation rather than Mack's own considered deliberation and, as such, it was not an effective "initiation" under Edwards and its progeny.

"This is an appropriate case for application of the exclusionary rule, the purpose of which is 'to deter – to compel respect for the constitutional guaranty in the only effectively available way – by removing the incentive to disregard it.'" (Punctuation omitted.) Collazo, 940 F2d at 423. Accordingly, we hold that all statements Mack made to police on November 1 and 2, 2012, after he invoked his right to remain silent at approximately 4:34 p.m. on November 1, were improperly obtained and must be suppressed.

Judgment reversed. All the Justices concur.