In the Supreme Court of Georgia

Decided: June 20, 2016

S16A0539. DURDEN v. THE STATE.

HUNSTEIN, Justice.

Appellant Johnathan Durden was convicted of malice murder and related

offenses in connection with the stabbing death of Ricky Grice, Jr. Durden now

appeals, alleging that the trial court erred in failing to grant his request to quash

his indictment and in failing to give a curative instruction after alleged improper

comments were made by the prosecutor during closing argument. Finding no

error, we affirm.[1]

---

[1] On July 1, 2013, a Whitfield County grand jury indicted Durden for malice murder, felony murder, aggravated assault and possession of a firearm during the commission of a felony. Durden was re-indicted on the same counts on July 5, 2013. On November 25, 2013, after a week long trial, a jury returned a guilty verdict on all counts. On November 26, 2013, the trial court sentenced Durden to life without the possibility of parole for the murder conviction and five consecutive years to serve for the weapon offense. The felony murder count was vacated by operation of law, see Malcolm v. State, 263 Ga. 369 (4) (434 SE2d 479) (1993), and the trial court correctly merged the aggravated assault count with the malice murder count. See Bell v. State, 284 Ga. 790 (1) (671 SE2d 815) (2009). Durden filed a motion for new trial on December 3, 2013, which was subsequently amended on September 2, 2014. The trial court held a hearing on Durden's motion for new trial on September 5, 2014, and denied the motion in an order filed October 20, 2014. Durden filed a notice of appeal

Viewed in the light most favorable to the jury's verdict, the evidence adduced at trial established as follows. Alexa Blubaugh, Durden's girlfriend, was living with him in his trailer on the date of the incident. Blubaugh and Durden had recently reconciled after separating for approximately one week, during which time Blubaugh had befriended Grice. On the day of the murder, Grice drove to Durden's residence to take Blubaugh and her sick dog to the veterinarian. Upon his arrival, Grice met Durden for the first time and learned that the canine had died a few hours earlier. Blubaugh testified at trial that, while Durden and Grice did not exhibit any animosity toward one another, Durden was acting paranoid and appeared to be jealous of Grice.

Less than an hour after his arrival, Blubaugh decided to leave with Grice in order to buy food and to shower, as Durden's trailer had no running water or electricity. Grice waited in the driver's seat of his single-cab pickup truck while Blubaugh entered the residence to retrieve her purse. Inside the residence, Durden asked Blubaugh if she was leaving him for Grice, to which Blubaugh said no. Blubaugh testified that she took her purse and cell phone and then

to the Georgia Court of Appeals on November 4, 2014. The Court of Appeals subsequently transferred the case to this Court where it was docketed to the January 2016 term and was thereafter submitted for decision on the briefs.

proceeded to Grice's truck. Durden followed, begging her not to leave the relationship. Again, Blubaugh said she was not leaving him and explained that she would return in a few hours. Durden responded by stating, "Well, if he's going to take my girl, the least he could do is shake my hand," then proceeded to the driver's side of Grice's truck. Grice rolled down his window and Durden attacked him with a knife. During the attack, Blubaugh recalled hearing Durden say, "You think you can just come up here and take my f—ing girl." Blubaugh jumped into the passenger's seat of the truck and yelled, "let's just go, let's just get away from here." As Grice attempted to turn the truck around, his arms fell, and he slumped back into his seat.

Though Grice had a rifle located behind the bench seat of his truck at the time of the attack, there was evidence that the rifle would not have been accessible to Grice from the driver's seat. Blubaugh also testified that Grice neither brandished the weapon nor threatened Durden prior to the incident.

Grice died from multiple stab wounds, including one that entered his heart and another that punctured his lung. Additionally, the State presented blood castoff evidence establishing that Grice had been seated in the driver's side of the truck, with the door shut, during the attack.

3

1. Though Durden has not enumerated the general grounds, we find that the evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Durden was guilty of the crimes for which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Initially, Durden was indicted by a July-term grand jury for murder and related offenses; that indictment was quashed because it was returned during the January-term of court. The district attorney immediately recalled the January-term grand jury, which returned a true bill against Durden for the same offenses. The trial court denied Durden's subsequent motion to quash the second indictment. Durden now argues on appeal, as he did below, that the second indictment was faulty because the January-term grand jury was not re-sworn after it "reconvened" following the substitution of at least one original grand juror with an alternate. He also argues that the bailiffs were not properly sworn to tend to the January-term grand jury. We will address each claim separately under de novo review as the issues concern the trial court's application of the law to undisputed facts. See Mack v. State, 296 Ga. 239 (765 SE2d 896) (2014).

4

*(a) Grand Jury Claim*

The January 2013 Term of the Whitfield County grand jury ran from January 14, 2013 to July 5, 2013. See OCGA § 15-6-3(12)(B). Sometime after the January-term grand jury was sworn, it was discovered that at least one of the members of the January grand jury was a convicted felon and therefore unqualified to serve. These individuals were replaced with qualified alternates. No additional oath was given after the alternates were placed on the January grand jury. After Durden's first indictment was quashed, the district attorney recalled the January grand jury on the last day of the January term of court to hear Durden's case. A true bill of indictment was returned against Durden that same day.

Durden argues that the January grand jury should have been re-sworn after the body "reconvened" with the alternate grand jurors to hear and indict his case on the last day of the term of court. "A grand jury must be administered an oath, as set forth in OCGA § 15–12–67(b)(2) and, as that section clearly contemplates, charged generally regarding their duties." State v. Grace, 263 Ga. 220, 221 (430 SE2d 583) (1993). Further, OCGA § 15-12-61(a) allows for three alternate grand jurors to be sworn and serve, "when any grand juror dies,

5

is discharged for any cause, becomes ill, or is for other cause absent during any sitting." Those alternate grand jurors "may serve as members of inspection and examination committees with the same authority and responsibilities as grand jurors and without regard to the maximum limitation on the number of grand jurors fixed herein." Id.

Concerning reconvening a grand jury, we have previously held "that a grand jury properly summoned, sworn, and charged to serve during a particular term of the court, may recess and reconvene as it sees fit to conduct its business in the course of that term, and need not be resworn or recharged by the court during that term." Grace, 263 Ga. at 221. This is because "grand jurors, like any sworn officials, elected or otherwise, are presumed to remember their oaths on return from any break in the performance of their duties." Id. Indeed, this Court has found "nothing in our state statutes or constitution which would require that the grand jury be resummoned by court order, resworn and recharged each time they reconvene during a term to conduct business." Id. (citation omitted).

Here, though alternate jurors were substituted during the January term of court, Durden points to no evidence that the January grand jury was ever

6

formally discharged from its duties prior to the end of its term.  Thus, the January grand jury continued to act within its term of court and remained empowered to act until the last day of its term.  As there is no evidence that the January grand jury was previously discharged, the members of the January grand jury did not need to be re-sworn prior to returning Durden's second indictment.  This argument is without merit.  See Grace, 263 Ga. 220.

*(b) Bailiff Claim*

Pursuant to OCGA § 15-12-69, grand jury bailiffs are also required to be sworn prior to tending to the grand jury. The oath is as follows:

> You do solemnly swear that you will diligently attend the grand jury *during the present term* and carefully deliver to that body all such bills of indictment or other things as shall be sent to them by the court without alteration, and as carefully return all such as shall be sent by that body to the court. So help you God.

Id. (emphasis added).

It is undisputed that the January-term bailiffs were sworn to tend to the January-term grand jury.  It is further undisputed that these same bailiffs were sworn to tend to the July-term grand jury one week prior to the start of the July term of court.  Although these same bailiffs were sworn with the July-term grand jury, the plain language of OCGA § 15-12-69 indicates that the bailiffs

7

were not divested of their authority to tend to the January-term grand jury as they were still acting within the present term, i.e., the January term. Consequentially, this argument fails.

Based on the foregoing, the trial court did not err by denying Durden's second plea in abatement and request to quash his second indictment.

3. Durden alleges that the trial court should have given a curative instruction during the State's rebuttal closing argument because, he says, the prosecutor commented on his failure to testify. During closing argument, defense counsel stated the following:

> Mr. Durden doesn't have to prove anything, but Mr. Durden testified to you for some five hours. Mr. Durden said I know I – he told the police, I know that I don't have to say a word, but something tells me I need to talk to you, I've got nothing to hide.[2]

In rebuttal, the prosecutor argued, "He tells you that his client testified before you; no, he didn't. Testimony in a courtroom is placed under oath. Each witness that took that stand raised their right hand and promised before God to tell the truth. The defendant didn't do that." Defense counsel did not object to the prosecutor's comments. Despite this, Durden has requested this Court

_____

[2]This comment was in reference to a five-hour, video-recorded, custodial statement Durden made to police, which was played for the jury.

review the prosecutor's statement for plain error.

As this Court recently held in Gates v. State, 298 Ga. 324 (781 SE2d 772) (2016), Georgia law does not make plain error review available for errors that have not been preserved in the trial court relating to alleged improper remarks made by a prosecutor during closing argument. Because Durden failed to object to the alleged error at trial, this issue has not been preserved for review by this Court. See Gates 298 at 329 ("Because the Georgia Legislature has not yet made plain error review available for errors relating to alleged improper remarks being made during closing argument, our prior case law relating to the waiver of issues on appeal stemming from improper closing arguments that were not objected to at trial remains unaffected by OCGA § 24-1-103 of Georgia's new Evidence Code.").

Further, this Court is unswayed by Durden's claim that the prosecutor's statement in closing argument amounts to an infringement on Durden's constitutional right to remain silent. Because Durden did not, in fact, testify at trial, the prosecutor's rejoinder was a permissible attempt to correct defense counsel's misstatement, rather than an impermissible effort to comment on Durden's failure to testify. See Jones v. State, 123 Ga. App. 310 (180 SE2d

603) (1971) (recognizing that "[t]he mere fact that the jury is made aware that the defendant is making an unsworn statement does not result in reversible error."). Further, during the charge of the court, the jury was instructed that statements made by the attorneys during closing arguments are not evidence and that they could not consider Durden's decision not to testify against him in rendering a verdict. Accordingly, we find no error in this regard.

Judgment affirmed. All the Justices concur.

10