**SECOND DIVISION**
**DOYLE, C. J.,**
**MILLER, P. J., and REESE, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 8, 2017**

# In the Court of Appeals of Georgia

A17A0046. PORTER v. THE STATE.

REESE, Judge.

Following a jury trial, Tomeka Porter was convicted of armed robbery[1] and sentenced to serve 20 years in confinement. She appeals from the denial of her motion for new trial, arguing that the evidence was insufficient to support her conviction, and that the trial court erred in admitting her custodial statement and the witness' show-up identification of her as one of the offenders. For the reasons set forth, infra, we affirm.

Viewed in the light most favorable to the jury's verdict,[2] the record shows the following facts. On August 9, 2013, the Appellant was in a DeKalb County hotel

---

[1] OCGA § 16-8-41 (a).

[2] See *Hogan v. State*, 330 Ga. App. 596, 597 (768 SE2d 779) (2015).

selling drugs when Ladarius Clark, Teneshia Harvey, Theophilus Porter ("Porter"),[3] and Sir Charles Wood came to her hotel room. The Appellant voluntarily drove Clark, Harvey, Porter, and Wood (collectively, the "co-defendants") to Gwinnett County so the Appellant could sell cocaine. While the Appellant drove, the co-defendants consumed drugs and alcohol.

After arriving in Gwinnett County, the Appellant's phone rang and she spoke to the caller in Spanish while she stopped at a couple of residences. After the conversation, the Appellant told the co-defendants that the caller "had some nice things," he would "pay well," and he was an "easy target." They discussed a plan to travel to the caller's home, "see[ ] what all he had"and steal items from the house.

On the night of the robbery, the caller, "A. H.," and his two roommates, "P. C." and "R. J.," were at A. H.'s home.[4] The Appellant and her co-defendants arrived at the house around 1:00 a.m. The Appellant and her female co-defendant, Harvey, exited the vehicle and went inside, stayed about ten to fifteen minutes, and returned to the car.

---

[3] Theophilus Porter is unrelated to the Appellant.

[4] A. H. subsequently moved out of the country and did not testify at the Appellant's trial.

During that visit to A. H.'s house, P. C. was asleep in the living room. The Appellant, Harvey, and A. H. went to A. H.'s room for a few minutes. Before leaving the residence, the Appellant woke up P. C., kissed him, and said "I'll come back for you." Upon returning to the car, the Appellant told the co-defendants, "[A. H.] ha[d] nice things" but did not pay what he owed her.

The Appellant and her co-defendants drove to the end of the street, but then decided collectively to return to the house and steal some things. The Appellant and Harvey returned to the house around 1:30 a.m. P. C. saw them through a window adjacent to the door, but did not notice the three male co-defendants hidden in the bushes around the side of the house. When P. C. opened the door, the male co-defendants appeared in the doorway and "jump[ed] inside" the home, in front of the Appellant and Harvey. Once the Appellant and her co-defendants were all inside, P. C. saw that one of the men had a gun.

The male co-defendants punched and beat P. C. and took him to another room occupied by A. H. They asked for the victims' wallets, keys, and cell phones. A. H.

3

grabbed a chair to fight back, but one of the men shot him in the shoulder. The male co-defendants took the victims' cell phones and a car key.[5]

While the male co-defendants were inside the residence, R. J. slept in his bedroom. He awoke upon hearing a "ruckus" in the home and opened his bedroom door. R. J. saw one of the male co-defendants holding a gun. R. J. closed his bedroom door and climbed out of his bedroom window to the street.

The Appellant and Harvey exited the house, returned to the vehicle, and the Appellant drove away. While leaving the neighborhood, the Appellant and Harvey saw a man, later identified as R. J., "frantically walking" down the street with a cell phone. Harvey told the Appellant to stop the car, after which she told the man, "I just want your phone." R. J. gave Harvey the phone, and she and the Appellant returned to A. H.'s residence. Once there, Wood got into the car's backseat and the Appellant started driving "[b]ack to DeKalb County."

At 3:07 a.m., a DeKalb County police officer initiated a traffic stop of the Appellant's car because it had a "cardboard tag." After the Appellant gave the police officer a driver's license that was not hers and a date of birth that did not match the

---

[5] Porter and Clark were later apprehended in Virginia with a stolen television and BMW that belonged to the victims.

4

license, the officer arrested her for identity fraud. Because neither Harvey nor Wood had a valid driver's license, several officers conducted an inventory search in preparation for impounding the vehicle. After discovering a handgun, the officers contacted neighboring precincts to determine if any crimes, such as entering autos or armed robberies, had recently occurred. The Gwinnett County Police Department responded that there had just been a home invasion during which someone was shot. Gwinnett County officers brought two of the home invasion victims, P. C. and R. J., to the site of the traffic stop. P. C. identified the Appellant, Harvey, and Wood as being involved in the robbery, and R. J. identified Harvey. The Appellant was taken into custody.[6]

1. The Appellant argues that the evidence was insufficient for a rational trier of fact to find her guilty of armed robbery. We disagree.

Generally, on appeal from a criminal conviction, the appellate court

---

[6] The Appellant and her co-defendants were jointly indicted for the armed robbery of A. H. In addition, the Appellant's male co-defendants were charged with the armed robbery of P. C., as well as aggravated assault, false imprisonment, and other crimes arising from this incident. Porter testified at the Appellant's trial, and he admitted that he had pled guilty to the crimes, but had not yet been sentenced. The Appellant's female co-defendant, Harvey, was charged with armed robbery and theft by taking. She also testified at the Appellant's trial, even though she had not yet entered a plea in the case.

view[s] the evidence in the light most favorable to the verdict and an appellant no longer enjoys the presumption of innocence. [The] Court determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*,[7] and does not weigh the evidence or determine witness credibility. Any conflicts or inconsistencies in the evidence are for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, [the Court] must uphold the jury's verdict.[8]

The standard of *Jackson v. Virginia* is met if the evidence is sufficient for any rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crime charged.[9]

A person commits armed robbery "when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon."[10] OCGA § 24-14-8 states, in part, "[t]he testimony of a single witness

---

[7] 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[8] *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004) (citations omitted).

[9] *Clark v. State*, 275 Ga. 220, 221 (1) (564 SE2d 191) (2002).

[10] OCGA § 16-8-41 (a).

is generally sufficient to establish a fact."[11] "[A] defendant may not be convicted on the uncorroborated testimony of an accomplice. The corroboration must be independent of the accomplice's testimony and it must connect the defendant to the crime or lead to the inference that he [or she] is guilty."[12]

At trial, the jury heard the testimony of victims P. C. and R. J. and the Appellant's co-defendants, Porter and Harvey. Both Porter and Harvey testified that the Appellant told them that the victims' home had "nice things," and that the Appellant had actively participated in the planning and implementation of the robbery. Both testified that the Appellant drove the co-defendants to the victims' home for the purpose of committing the robbery. P. C. corroborated the co-defendants' testimony by testifying that he was " a hundred percent" sure that the Appellant was the woman who kissed him and, later, came into the house with the co-

---

[11] In 2011, the Georgia General Assembly repealed the Evidence Code in its entirety and replaced it with a new Evidence Code, the provisions of which became effective on January 1, 2013, and which applies to any motion, hearing, or trial commenced on or after such date. Ga. L. 2011, p. 100, §§ 1, 101. Pursuant to that legislative act, former OCGA § 24-4-8 has been reenacted as OCGA § 24-14-8. Because the instant trial took place in August 2015, the new Evidence Code applies.

[12] *Susan v. State*, 254 Ga. App. 276, 279 (1) (562 SE2d 233) (2002) (citing former OCGA § 24-4-8) (citations and punctuation omitted).

defendants. We conclude that the evidence presented was sufficient for a rational trier of fact to find the Appellant guilty of armed robbery beyond a reasonable doubt.[13]

2. The Appellant contends that the trial court erred in admitting the portion of her custodial statement that she made after invoking her right to counsel. We disagree.

"In reviewing a trial court's ruling on a motion to suppress, [the appellate court] must affirm the trial court's findings on disputed facts unless clearly erroneous."[14] When the recorded interrogation sessions at issue are made part of the appellate record, we review the trial court's application of the law to the undisputed facts de novo.[15]

As the Supreme Court of Georgia has instructed,

(1) A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the

---

[13] See *Robinson v. State*, 281 Ga. App. 76, 78 (1) (635 SE2d 380) (2006) (evidence was sufficient where the victims of the armed robberies both identified the defendant as the perpetrator and police officers testified that the defendant had a gun when they approached him).

[14] *Mack v. State*, 296 Ga. 239, 241 (765 SE2d 896) (2014) (citation omitted).

[15] Id. at 241-242.

suspect reinitiates the conversation. If the police persist in questioning a suspect who has requested that counsel be present, any resulting statements made by the suspect are inadmissible in the State's case-in-chief. (2) In order for a suspect to properly invoke his right to counsel during a custodial interrogation, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.[16]

Thus, "[a]n accused will be found to have unambiguously and unequivocally asserted his right to remain silent where he declares that he is finished talking or otherwise expresses the clear desire for police questioning to cease."[17]

In this case, two Gwinnett County detectives interviewed the Appellant. During questioning, she repeatedly denied knowing anything about the armed robbery at issue, claiming that she was not present. When the detectives continued to ask her about discrepancies in her statements, she stated, "I'll probably have to stop and let my lawyer handle the rest of it." The detectives left the room without asking further questions. About 30 minutes later, the detectives returned to the room, and one asked

---

[16] *State v. Philpot*, 299 Ga. 206, 206-207 (787 SE2d 181) (2016) (citation and punctuation omitted).

[17] *Mack*, 296 Ga. at 242 (1) (citations and punctuation omitted).

the Appellant if she wanted to tell them "what really happened?" The Appellant continued to deny any knowledge about what had occurred. A detective asked her again, "Do you want to talk about what happened?" The Appellant responded that she had already talked to them. The detectives then left, but one detective returned to the room about 90 minutes later. He told the Appellant that law enforcement officers had apprehended the other people suspected of being involved in the armed robbery, and asked her "if their story [is] going to be the same as [hers]?" When the Appellant did not respond, the detective told her, "If you don't want to talk, just tell me." The Appellant responded by repeating her claim of ignorance about the incident. The detective and the Appellant talked for a few minutes before the detective mentioned that someone was shot during the armed robbery. The Appellant responded, "I didn't know anything about anybody getting shot." Then, after remaining silent for about six minutes, the Appellant said, "I need a lawyer. (unintelligible) don't want to put myself (unintelligible) you said somebody got shot. I need a lawyer." The detective immediately left the room, and the interrogation ended.

After reviewing the recording of the custodial interview, we find that the Appellant's initial statement, "I'll probably have to stop and let my lawyer handle the

rest of it," was not an unequivocal assertion of her right to counsel.[18] This conclusion is bolstered by her later statement, "I need a lawyer," which was clearly a request for counsel. Even if her first statement was sufficient, the detectives ceased their interrogation, and the only statements by the Appellant afterward were redundant of her previous, unobjected-to statements.[19] Thus, we find as a matter of law that the trial court properly admitted the Appellant's custodial pre-trial statement.

3. The Appellant asserts that the trial court improperly admitted evidence of the victims' show-up identification of her as one of the participants in the armed robbery. We disagree.

Generally, this Court first determines

whether the identification procedure was impermissibly suggestive. If the answer to that inquiry is negative, we need not consider the second question — whether there was a substantial likelihood of irreparable

---

[18] See *Brooks v. State*, 271 Ga. 698, 699 (2) (a) (523 SE2d 866) (1999) ("The comments on which [the] [A]ppellant relie[d], when viewed in context, were not clear invocations of the right to counsel and thus the officers had no obligation to cease questioning her immediately.") (citation omitted).

[19] See *Harrington v. State*, 300 Ga. 574, 580 (3) (a) (797 SE2d 107) (2017) (It was harmless error to admit the portions of the Appellant's custodial interrogation that followed his alleged invocation of his right to remain silent, because his subsequent statements were reaffirmations of his "previous unobjected-to statements.").

11

misidentification. Conversely, we may immediately proceed to the second question and, if the answer thereto is negative, we may entirely pretermit the first question.[20]

Thus, even if the circumstances surrounding the Appellant's identification "rendered the showup impermissibly suggestive, the evidence is inadmissible only if[,] under the totality of the circumstances, there was a substantial likelihood of irreparable misidentification."[21]

Here, a Gwinnett County police officer conducted the show-up identification of the Appellant at 4:28 a.m., about three hours after the robbery. The show-up occurred on the side of the I-85 interstate with victims P. C. and R. J. in a police car. Neither the Appellant nor her co-defendants were handcuffed. P. C. positively identified the Appellant, telling the Gwinnett County officer "that he was 100 percent sure," that the Appellant was the woman who kissed him and came back to rob them. R. J. was unable to identify the Appellant.

At trial, R. J. testified that the Gwinnett County officer who transported him and P. C. to the site of the traffic stop told them "that there are some - some suspects -

---

[20] *Butler v. State*, 290 Ga. 412, 415 (3) (721 SE2d 876) (2012) (citation and punctuation omitted).

[21] Id. (citations and punctuation omitted).

some people that we . . . think are connected to what has happened" and asked them, "if possible, to identify those . . . individuals." The officer testified, however, that he had extensive experience working with crime victims and conducting show-up identifications. He also testified as follows:

> I made sure to advise the victims that[,] just because I'm taking them to show them someone, that does not necessarily mean that these are the people that did it. And that they would have [to] recollect from their memory, from their thoughts of what occurred, [to determine] if these are actually the individuals [who robbed them]. So I relay that to them that they did not have to make an identification. If they were not sure, they did not have to . . . make an identification.

The Appellant argues in her brief that having both victims together during the show-up, and the use of the words "some suspects" by the Gwinnett County officer, was impermissibly suggestive. Pretermitting the alleged suggestiveness of the show-up procedure, however, the Appellant has failed to show that there was a substantial likelihood of misidentification.

At trial, P. C. testified that the Appellant was wearing the same clothes during the armed robbery that she was wearing during the show-up. P. C. had the opportunity to see the Appellant at close range when she kissed him and told him that she would be back. The Appellant's co-defendants also identified her as a participant in the

13

crime. Based on the foregoing, we find that the trial court did not err in admitting the show-up identification of the Appellant.

*Judgment affirmed. Doyle, C. J., and Miller, P. J., concur*.