In the Supreme Court of Georgia

Decided: May 23, 2016

S16A0003. CHELEY v. THE STATE.

BLACKWELL, Justice.

Shanqulalandali Cheley was tried by a Chatham County jury, and he was convicted of murder and other crimes in connection with the killing of Amber DeLoach. Following the denial of his motion for new trial, Cheley appeals, contending that the trial court erred when it denied his motion to suppress statements that he gave to law enforcement officers, when it denied his motion to exclude or redact a trial exhibit, when it limited his cross-examination of two jailhouse informants who testified for the prosecution, and when it failed to rebuke the prosecuting attorney for an allegedly improper closing argument. Upon our review of the record and briefs, we see no error, and we affirm.[1]

_____

[1] Cheley killed DeLoach on September 30, 2012. Cheley was indicted on January 9, 2013, reindicted on May 20, 2013, and ultimately charged with malice murder, two counts of felony murder (premised on rape and aggravated assault), rape, aggravated assault, arson, and possession of cocaine. His trial began on December 16, 2013, and the jury returned its verdict four days later, finding Cheley guilty of all the crimes with which he was charged, except rape and felony murder premised on rape. Cheley was sentenced to imprisonment for life for malice murder and imprisonment for a consecutive term of fifteen years for

1. Viewed in the light most favorable to the verdict, the evidence shows that the Savannah Fire Department responded around 6:45 on the morning of September 30, 2012 to a report of a vehicle engulfed in flames. They found DeLoach's car, which had been set afire intentionally, using gasoline as an accelerant. Inside the trunk of the car, firefighters found DeLoach's body. The medical examiner later determined that DeLoach had been sexually assaulted and strangled to death, prior to her body being put into the trunk. At a gas station near the location at which DeLoach's car and body were found, investigators discovered a video surveillance recording, which depicted a man arriving at the gas station on foot and purchasing a lighter and a container of gasoline, all around 6:15 on the morning of September 30.

That video recording led the investigators to Cheley, whom they interviewed on October 4. Cheley agreed to give a statement to the investigators,

---

possession of cocaine. At first, Cheley also was sentenced for arson, but the trial court later vacated that conviction and sentence upon a finding that the indictment had a defect that was fatal to the arson charge. The verdict as to felony murder was vacated as a matter of law, and the aggravated assault merged with the malice murder. See Malcolm v. State, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993). Cheley timely filed a motion for new trial on January 15, 2014, and he amended his motion on September 15, 2014. The trial court denied the motion on March 4, 2015, and Cheley timely filed a notice of appeal on April 1, 2015. The case was docketed in this Court for the January 2016 term and submitted for decision on the briefs.

and at first, he claimed that he had been at a club for most of the night in question and that he had gone straight home. He eventually admitted, however, that his car had run out of gas and that he had walked to the gas station near the crime scene to buy a lighter and gasoline. When his interview concluded, Cheley was arrested on an unrelated charge, and in the course of that arrest, officers found that Cheley had cocaine on his person. Cheley gave a second statement to investigators on October 18, and in that statement, he admitted that he had sex with DeLoach on the night in question, but he maintained that it was consensual.

Forensic investigators later matched Cheley's DNA to biologic material found on a vaginal swab taken from DeLoach's body. Investigators also matched DeLoach's DNA to blood found in Cheley's home. His girlfriend confirmed that Cheley was, in fact, the man depicted in the gas station video surveillance recording, and she identified the blue and tan comforter in which DeLoach's body had been wrapped as one that belonged to Cheley. To corroborate that identification, his girlfriend supplied investigators with a pillowcase that matched the comforter.

At trial, Cheley did not dispute that he had been with DeLoach on the night of her killing, but he maintained — mostly by reference to his October 18

statement — that she was alive when he last saw her and that she must have been killed by someone else. The jury rejected that explanation, and on appeal, Cheley does not assert that the evidence is insufficient to sustain his convictions. We nevertheless have considered the sufficiency of the evidence, and we conclude that it was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Cheley was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Cheley filed a pretrial motion to suppress the statements that he gave to investigators on October 4 and October 18, asserting that both statements were elicited by custodial interrogations that followed his invocation of his right to remain silent. Following a Jackson-Denno hearing,[2] the trial court found that Cheley failed to unequivocally assert his right to remain silent, and it denied his motion. Cheley now enumerates the denial of his motion to suppress as error. On appeal, we must accept the factual findings and credibility determinations of the trial court unless clearly erroneous, see Bright v. State, 265 Ga. 265, 280

---

[2] See Jackson v. Denno, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

(5) (b) (455 SE2d 37) (1995), and accepting those findings and determinations in this case, we see no error in the denial of the motion to suppress.

On October 4, Cheley — who had been identified as the man who was seen purchasing gasoline and a lighter near the location at which DeLoach's body was found in a car engulfed in flames — agreed to speak with investigators and was brought to a police station. There, investigators advised Cheley of his <u>Miranda</u> rights,[3] and Cheley acknowledged that he understood them. After answering a number of questions about his whereabouts on the evening of September 29 — and after admitting that he had walked to the gas station and filled a container with gasoline — Cheley was told that "people" already had identified him as having been involved in the events about which the investigators had been asking him, "up to the point where [he] went to get gas." Cheley then complained that the investigators had not revealed the subject of their investigation. One of the investigators replied: "I'm gonna get to all of that when you completely finish telling the . . . ." Cheley cut him off, however, and said: "I'm completely finished." The investigators then asked Cheley about

---

[3] See <u>Miranda v. Arizona</u>, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

his activities after leaving the gas station, and Cheley answered their questions without apparent hesitation. The investigators eventually told Cheley that they were investigating a homicide.

In context, Cheley's statement that he was "completely finished" was not an unequivocal assertion of his right to remain silent. To the contrary, a reasonable law enforcement officer would have understood Cheley to mean only that he had lost patience with the repeated and continued questions about what he had done *before* buying gasoline and that he wanted to know what the investigators were investigating. See Perez v. State, 283 Ga. 196, 198 (657 SE2d 846) (2008) ("[A] suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." (Citation omitted)). See also Weaver v. State, 288 Ga. 540, 544 (4) (705 SE2d 627) (2011) (viewed in context of the interrogation, even statement "I don't want to say nothing" was reasonably understood as a part of the "give-and-take" of interrogation, rather than an invocation of the right to remain silent).

Later in his October 4 interview, Cheley appeared to become frustrated by efforts to cast doubt on his story that he had gone straight home after leaving the

6

gas station. Cheley made several remarks in quick succession about having "nothing else to say" and being "done." Even assuming that these remarks amount to an unequivocal assertion of the right to remain silent, there was no error in the refusal of the trial court to suppress statements that Cheley made following the assertion. The record shows that, after Cheley made the remarks about being "done" and having "nothing else to say," investigators permitted him to make a telephone call, they told him that they had put an envelope in his pocket that he would have when he went to the jail, and they answered his questions about why he was being arrested. None of these actions were reasonably likely to elicit an incriminating response, and none did. See Rhode Island v. Innis, 446 U. S. 291, 299 (2) (A) (100 SCt 1682, 64 LE2d 297) (1980) ("Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," meaning "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect").

Two weeks later, on October 18, Cheley asked for the opportunity to give a second statement, and he was brought to the police station from the jail. The investigators again advised Cheley of his Miranda rights, and he again

acknowledged that he understood those rights. Cheley repeated the claims that he had made on October 4: that he had run out of gas and walked to the gas station to fill a container with gasoline and buy a lighter so that he could smoke. At one point, Cheley said that he was "done talking" and had "no more to say," and the record shows that the investigators then stopped asking questions about his case, they answered a number of questions that Cheley posed, and they allowed Cheley to leave the interrogation room to smoke a cigarette. None of these actions were reasonably likely to evoke an incriminating response, and Cheley did not make any statements that should have been suppressed prior to this smoke break.

About 30 minutes later, Cheley returned to the interrogation room. One of the investigators testified that Cheley had told them during his smoke break that he wanted to continue his statement, and — although the trial court would have been entitled to believe the detective's testimony without additional evidentiary support — a transcript of the interview shows that Cheley resumed the interrogation by asking the investigators about their "theory" of the case, he thanked them for "not being a\*\*holes," and he did not dispute the investigators when they repeatedly noted that he had told them during his smoke break that

8

he wanted to continue to talk with them. These actions demonstrated that Cheley initiated the further dialogue with the detectives and that he did not intend to exercise his right to remain silent. See Larry v. State, 266 Ga. 284, 286 (2) (a) (466 SE2d 850) (1996).

After talking briefly about the investigators' "theory," the discussion moved on to family, and the detectives offered to bring Cheley's mother to the station to talk to him. After Cheley confirmed that he would like to talk to his mother, the detectives asked how his mother could be contacted. And while they waited for Cheley's mother to be contacted, they continued to talk with Cheley, but not about the case. Instead, Cheley and the investigators talked about family, basketball, and lunch. After it was determined that Cheley's mother was not available, the investigators told Cheley that they would arrange a visit, they continued to make small talk and eat lunch, and Cheley repeatedly said that he would continue talking about the case later. The investigators told Cheley that they had "no problem" with him talking to his mother, they discussed whether he also would like to see his children, and they continued eating lunch without asking him about the case. Cheley then took another smoke break without making any incriminating statements.

9

About 35 minutes later, Cheley returned to the interrogation room to continue his statement. He acknowledged that he remembered and understood his rights, and he said that he did "not at all" mind talking to the investigators. Although Cheley made several comments about wanting to "rest" and go back to the jail, he also said that he was being treated fairly, that he was planning to continue talking to the investigators later, and that he wanted to "tell [them] everything." See Ridley v. State, 290 Ga. 798, 801 (4) (725 SE2d 223) (2012) (repeated statements to "take me on to jail" were not unequivocal and unambiguous invocation of right to silence). When the investigator to whom Cheley had promised to talk returned to the interrogation room, Cheley spontaneously said that "everything that we been talking about, it's been all willingly," and he then admitted for the first time that he, indeed, had contact with DeLoach on the night and morning of her murder, claiming that he had sex with her in exchange for drugs. When Cheley soon thereafter said that he wanted a lawyer, the investigators stopped questioning him and concluded the interrogation. Having reviewed the entirety of the transcript of the October 18

interrogation, we find that the trial court did not err when it found that Cheley did not unambiguously and unequivocally invoke his right to remain silent.[4]

3. Cheley also claims that the trial court erred when it denied his motion to either exclude or redact a prosecution exhibit. The exhibit at issue was one of several photographs that depicted the contents of the trunk of DeLoach's car, and it showed numerous items found in the trunk, including DeLoach's body wrapped in a comforter, a gasoline-soaked towel, several articles of clothing, and a photograph of an unidentified young girl sitting in a field. According to Cheley, the probative value of this exhibit — at least the portion showing the photograph of the girl — was "substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403. When the trial court considered the admissibility of the exhibit, a fire investigator testified that the exhibit showed how numerous

---

[4] We note that, even if it were otherwise, Cheley has not shown that he was harmed by the trial court's refusal to suppress his October 18 statement. That statement was barely noted at trial by the State, but it was crucial to Cheley's defense (especially given that DNA evidence established that he had sex with DeLoach just prior to her death) because it allowed him to present his story — that he had sex with DeLoach in exchange for drugs but did not kill her — without having to testify. In his closing argument, Cheley relied on the October 18 statement (as well as consistent testimony provided by a jailhouse informant and the results of a drug test conducted in connection with DeLoach's autopsy) to imply that DeLoach was involved in risky behaviors and that anyone could have killed her after she and Cheley went their separate ways. In response, the State had to minimize the October 18 statement and argue that the only evidence that DeLoach had sex with Cheley in exchange for drugs was Cheley's self-serving October 18 statement.

11

items in the trunk were arranged in multiple layers on and around DeLoach's body (and on top of the gasoline-soaked towel) in an attempt to sustain a fire. The investigator also testified that the way in which DeLoach's body was wrapped (and the fact that the trunk was closed after the fire was lit) actually prevented most of her body from being severely burned. And the exhibit at issue was of particular importance because it showed how DeLoach's body was located in relation to both the gasoline-soaked towel and the bottom of the trunk.

Moreover, the exhibit presented little danger of prejudice. The photograph of the girl was one of many items found on and around DeLoach's body. The jury heard no testimony about the photograph of the girl — much less about the girl's identity — and nothing in the record suggests that the attention of the jury was drawn in any way to the photograph of the girl.[5] And although it might be unusual to find such a photograph in the trunk of a car, DeLoach's twin sister testified that they were moving the weekend that DeLoach was killed, so (to the extent that the jury gave any consideration at all as to why so many items were

_____

[5] Cheley speculates that the jury would have inferred that the photograph depicted DeLoach as a young girl, but this strikes us as unlikely. Numerous photographs of DeLoach (both in life and after she was killed) were presented to the jury, and they showed her with blond hair. The girl depicted in the photograph contained in the trunk appears to have brown hair.

found in the trunk of DeLoach's car), they likely would have concluded that they were related to the move and had nothing to do with the crimes other than that they were used in an attempt to burn DeLoach's body. The trial court did not abuse its considerable discretion when it determined that the exhibit's potential for prejudice did not substantially outweigh its probative value. See, e.g., Moss v. State, ___ Ga. ___ (5) (b) (783 SE2d 652) (2016).

4. Cheley also argues that the trial court erred when it prohibited him from cross-examining two jailhouse informants about the charges and potential sentences that they faced before giving testimony in this case for the prosecution. But it was established at trial that neither of the informants had entered into any agreement with the State. And where a witness has not obtained such a "deal," the defendant has "broad scope in exposing the potential bias in the witness's testimony, [but he] may not bring out the potential penalties faced by the witness. Jackson v. State, 294 Ga. 34, 37 (3) (751 SE2d 63) (2013), overruled on other grounds by Hamm v. State, 294 Ga. 791 (756 SE2d 507) (2014).

Here, Cheley was permitted to inquire broadly of both informants about potential bias. He asked the first informant about his plea and the fact that he

13

was incarcerated and waiting to be sentenced, and the informant acknowledged that he hoped his testimony against Cheley would give him "a benefit for . . . sentencing." Cheley asked the second informant about his prior convictions, his incarceration, and the fact that — at the time he first reported Cheley's jailhouse confession — he had additional pending charges that had since been dead docketed, and Cheley was able to inquire about the informant's motive to provide a statement against Cheley in order to "get a benefit in [his] pending charges." The trial court charged the jury that it could consider "any possible motive" that a witness may have for testifying, including "pending prosecutions, negotiated pleas, or similar matters." And Cheley even argued in his closing that one of the informants was using his testimony "to get out of jail free." Cheley was able to examine whether the informants had a motive to fabricate their testimony in order to curry favor with the State, and "[t]he mere fact that [Cheley] was unable to ask [the informants] to conjecture about possible punishment . . . did not amount to an abuse of the trial court's discretion." Hodo v. State, 272 Ga. 272, 275 (4) (528 SE2d 250) (2000).

5. Finally, Cheley contends that the trial court should have rebuked the prosecuting attorney after she said in her closing argument that one of the

14

jailhouse informants may have appeared nervous because "everybody's heard the saying . . . 'snitches get stitches.'" Even assuming that this argument was improper under OCGA § 17-8-75, it is well-established that a trial court has no duty to rebuke a prosecutor under that statute unless specifically requested by the defendant. See, e.g., Woodham v. State, 263 Ga. 580, 580 (1) (a) (439 SE2d 471) (1993). Here, the trial court sustained Cheley's objection to the argument at issue, and Cheley did not request a rebuke (or any other corrective action) after his objection was sustained. As a result, the trial court had no duty to rebuke the prosecuting attorney. Id.

Judgment affirmed. All the Justices concur.