300 Ga. 574
FINAL COPY

S16A1545.  HARRINGTON v. THE STATE.

NAHMIAS, Justice.

Appellant Brandon Harrington was convicted of the malice murder and armed robbery of Mamie Wright and related crimes.  On appeal, he contends that the trial court erred in admitting his custodial interviews and that the evidence presented at trial was insufficient to support his conviction for armed robbery.  We agree with the latter contention and reverse Appellant's armed robbery conviction.  We also have identified a merger error made by the trial court in sentencing Appellant, and we therefore vacate the judgment in part and remand for Appellant to be sentenced for burglary.  We otherwise affirm the trial court's judgment.[1]

---

[1]  The crimes occurred on January 5, 2011.  On May 16, 2011, a Crisp County grand jury indicted Appellant for malice murder, felony murder based on burglary, felony murder based on aggravated assault, aggravated assault, armed robbery, burglary, possession of a firearm during the commission of a felony (burglary and aggravated assault), and two counts of possession of a firearm by a first offender probationer.  The last two firearm charges were bifurcated for trial, and Appellant was tried on the seven other charges from March 5 to 9, 2012, and found guilty of all of them.  On March 9, he was tried on and found guilty of the final two firearm possession charges.  The trial court sentenced Appellant to serve life in prison without parole for malice murder, a concurrent life sentence for armed robbery, and consecutive terms of five years for each of the three firearm convictions.  The court merged the remaining counts.  As discussed in Division 2 (c) below, the trial court erred in merging the burglary count, and Appellant should be sentenced on that charge.

1.    Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. On the morning of January 5, 2011, 72-year-old Mamie Wright went grocery shopping. At 10:43 a.m., she called 911, saying that she had found an intruder when she arrived home and that he had shot her and then fled. When paramedics arrived, they found Wright seriously wounded but alive and responsive, lying on her back on her bedroom floor. She had been shot twice, once in her neck and once in her chest. Wright said she did not know the intruder, whom she described as a black man wearing a red shirt and blue jeans. She was taken to the hospital, where she died later that day from internal bleeding caused by the bullet wounds. The bullet in her chest was recovered during her autopsy.

The GBI crime scene investigator testified that Wright's trailer home appeared to have been burglarized. A window had been broken and raked out to allow someone to crawl through it. Wright's bedroom had been ransacked, with drawers open, items overturned, two piggy banks opened and change strewn on the bed, and a rolled-up birth certificate on the floor. In addition,

Appellant filed a timely motion for new trial, which the trial court denied on March 18, 2016. Appellant then filed a timely notice of appeal, and the case was docketed in this Court for the September 2016 term and submitted for decision on the briefs.

discarded Christmas wrapping paper was found on the living room floor. Three bullets were found at the scene — one in a chest in the bedroom, one in the doorway of the bedroom, and one under the trailer. The bullets were fired from a revolver, and analysis of the placement of these bullets and other bullet marks indicated that a total of five shots had been fired in the home. Analysis of bloodstains, which included one big and deep stain in Wright's bedroom and several smaller transfer stains, indicated that one shot was fired almost straight down at the victim on the floor — an "execution type shot." Bags of groceries were lying nearby, just inside the bedroom door.

Appellant lived in the housing complex across the street from Wright's trailer, and he was interviewed initially as part of a general canvas of the area. He said that he had been home all day except for a trip to a convenience store around 10:30 a.m. Further investigation revealed that Wright owned a cell phone, which she had deactivated about six weeks earlier. The phone was reactivated on the day of the murder, January 5, and after five unsuccessful attempts, was assigned Appellant's phone number and transferred to his Verizon account. The first attempt was made at 11:19 a.m.; the final one at 12:58 p.m. Based on this information, investigators went to Appellant's residence shortly

3

after 11:00 p.m. on January 6. When they arrived, they found him near his house inside a car with a woman. After he got out, the woman handed the investigators a cell phone that he had left in the car. It was Wright's cell phone. Appellant was taken into custody.

Investigators then searched Appellant's house and his mother's dark blue Buick SUV, which he drove sometimes. In Appellant's house, they found a box with several different types of handgun ammunition, including .38 caliber cartridges, and a Wii video game console. Wright had kept in her home a Wii console wrapped in paper that looked like the paper found on her living room floor. In the SUV, investigators found a large shoebox containing a number of items linked to Appellant, including his NRA membership application and a digital scale with his thumbprint, and a number of items linked to Wright, including pins commemorating her service with the American Legion Auxiliary and her daughter's work at the Atlanta Journal-Constitution, a decorative birth certificate holder, and micro-cassettes with her voice on them. The birth certificate found in Wright's home fit in the decorative holder. The shoebox also contained a .32 caliber revolver, a .38 caliber revolver, .38 caliber

ammunition, and cartridge cases from fired .38 caliber rounds.[2]  The .38 caliber revolver had two bullets inside, which were the same type as the bullet found under Wright's trailer, and ballistics testing showed that this revolver was the gun that shot the bullet extracted from Wright's body and the three bullets found at the crime scene.

Surveillance video from the housing complex where Appellant lived showed a black male wearing a large white jacket and dark pants walking through the complex from the direction of Wright's home carrying two armloads of items at 9:51 a.m.  The man walked into Appellant's house at 9:52 a.m.  At 10:25 a.m., he left Appellant's house in a dark-colored SUV, returning at 10:41 a.m., two minutes before Wright's 911 call.  Surveillance footage from a nearby convenience store showed that Appellant, who is a black male, was there between 11:39 a.m. and 11:44 a.m., wearing a large white jacket and dark pants and driving an SUV matching the SUV from the housing complex video.

Appellant spoke to investigators in two video recorded custodial interviews, both of which were played for the jury over his objection.  In these

---

[2]  Appellant's possession of these two guns was the basis for his two convictions for possession of a firearm by a first offender probationer.

5

statements, as in his initial, non-custodial statement, Appellant claimed that the only time he left his house on the day of the murder was to go to the store around 10:30 a.m. Although he denied any involvement in the crimes, in the second interview he acknowledged his possession of Wright's cell phone and the items found in the SUV; he claimed that he bought the phone from a crack addict and found the other items. The State also presented similar transaction evidence that Appellant had committed two other burglaries near the housing complex where he lived, stealing military service pins and cell phones from one residence and jewelry from another.[3] Appellant did not testify at trial.

2. (a) Appellant contends that the evidence presented at trial was legally insufficient to support his conviction for armed robbery. We agree. The indictment alleged that Appellant committed armed robbery in violation of OCGA § 16-8-41 by "unlawfully tak[ing] a . . . cell phone . . . from the immediate presence of Mamie Evelyn Wright, by the use of a handgun." "The State therefore was required to prove beyond a reasonable doubt that [Appellant]'s use of the handgun occurred 'prior to or contemporaneously with

---

[3] Because this case was tried before January 1, 2013, it was governed by Georgia's old Evidence Code. See Ga. L. 2011, p. 99, § 101.

6

the taking'" of the cell phone. <u>Fox v. State</u>, 289 Ga. 34, 36 (1) (b) (709 SE2d 202) (2011) (citation omitted). Moreover, "the 'taking' of property is not a continuing transaction which ends only when the defendant leaves the presence of the victim. Instead, the taking is complete once control of the property is transferred involuntarily from the victim to the defendant, even if only briefly." Id. (citations omitted).

The evidence at trial showed that Wright found Appellant inside her trailer when she came home from the grocery store. But there was no direct evidence that Appellant took the cell phone from Wright after she arrived, and it is at least equally possible to infer from the evidence that Appellant took possession of the phone before Wright interrupted his burglary during his second entry into her home. In particular, the evidence showed that Wright had deactivated the cell phone several weeks earlier, making it unlikely that she was carrying the phone around with her; that Appellant walked to his house from Wright's trailer carrying two armloads of items and then drove back to the trailer several minutes before Wright discovered him; and that Appellant fled the trailer immediately after shooting Wright, making it less likely that he paused to steal more items after confronting her. Because it is at least equally likely

7

that Appellant took the cell phone before rather than after encountering the victim, the evidence was insufficient to support a finding beyond a reasonable doubt that Appellant used a handgun to take the cell phone from Wright. Accordingly, Appellant's armed robbery conviction must be reversed. See Fox, 289 Ga. at 37; former OCGA § 24-4-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.").

(b) Appellant does not dispute that the evidence was sufficient to support the jury's verdicts of guilty on the other counts of the indictment. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record, and we conclude that the evidence presented at trial and summarized above was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Appellant was guilty of those crimes. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citations omitted)).

8

(c) As the State correctly points out, however, the trial court erred in merging Appellant's guilty verdict for burglary into the verdict for felony murder based on burglary. Because that felony murder count was actually vacated by operation of law, the burglary count could not merge into it, and burglary also does not merge into a malice murder conviction. See Lupoe v. State, 300 Ga. 233 (794 SE2d 67) (2016); Favors v. State, 296 Ga. 842, 848 (770 SE2d 855) (2015). Accordingly, we vacate the judgment in part and remand the case to the trial court with direction to enter a conviction and impose a sentence on the burglary count.

3. Appellant contends that the trial court erred in denying his motion to suppress his two recorded custodial interviews. GBI Agent Blair Sasnett and Cordele Police Department Detective Ketorie Sales conducted the two interviews with Appellant at the police station shortly after he was taken into custody on the night of January 6, 2011. Before trial, Appellant filed a motion to suppress on the ground that portions of the first interview and all of the second interview were conducted after he invoked his right to remain silent.

The trial court denied Appellant's motion after holding a <u>Jackson-Denno</u>[4] hearing at which the video recordings of the interviews were played and Agent Sasnett and Detective Sales testified. We see no reversible error in that ruling.

(a) As to the first interview, the video recording shows that it began at 12:59 a.m. and lasted about an hour. The officers first went over Appellant's rights under <u>Miranda v. Arizona</u>, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), including his right to remain silent and to have an attorney present, and Appellant signed a waiver of those rights and agreed to talk about the shooting at the victim's home. Appellant also consented to a gunshot residue test of his hands. After that test was completed, he was questioned about his activities on January 5; Appellant repeatedly denied any involvement in the shooting or burglary.

The officers then told Appellant that they knew he had the victim's cell phone, and asked how he got it. About 58 minutes into the interview, the following exchange occurred:

AGENT SASNETT:    You need to start talking.
APPELLANT:    Naw, I don't need to start doing nothing.

---

[4] See <u>Jackson v. Denno</u>, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

10

AGENT SASNETT:     Yeah you do!

DETECTIVE SALES:   Brandon! Think about this. Think about all this man. Take a deep breath and think about it.

APPELLANT:         Listen, man, I'm tired of talking. You feel me. I want to eat. I'm tired of talking.

AGENT SASNETT:     You tired of talking?

APPELLANT:         Whatever y'all say y'all got. Y'all say y'all got evidence on me cuz? Lock me up, you feel me! Know what I'm saying? If y'all ain't, I'm ready to go home, cuz. Talkin' and.

DETECTIVE SALES:   Well, let's sit back and think about what we said for a while. I really want you to sit back and think. Sit back and think about some stuff. Uh, I want you to have some me time. And think about all this.

AGENT SASNETT:     Alright, let's take him back, come on. Let's go.

APPELLANT:         Man, y'all can take me to the county for this s**t, cuz. Man, listen man, naw listen. I ain't mother f**kin shot nobody dog! I ain't broke in nobody's s**t, cuz. Y'all ain't fixin to pin s**t on me my ni**a. F**k you then cuz.

DETECTIVE SALES:   How did you get the phone?

APPELLANT:         Man, man, listen, man.

The officers then continued to question Appellant about the victim's cell phone, and he continued to deny any involvement in the crimes. About two minutes later, Appellant said, "Man, I ain't got nothing else to say dog" and "I'm ready to go cuz." The officers then stopped their questioning and took

11

Appellant to a holding cell. Agent Sasnett returned to the interview room within a minute and ended the interview tape at 2:00 a.m. by saying that Appellant "advised he did not want to talk anymore. Interview was concluded."

Appellant asserts that his statements "I'm tired of talking" and "I'm ready to go home" were an invocation of his right to silence that was not honored. But we need not decide if Appellant unequivocally invoked his right to remain silent with these statements. See Mack v. State, 296 Ga. 239, 242 (1) (765 SE2d 896) (2014) ("'[A]n assertion of the right to remain silent during custodial interrogation must be unambiguous and unequivocal before interrogators are required to stop their questioning[.]'" (citation omitted)). Even assuming that the two-minute portion of the first interview that followed this alleged invocation should not have been admitted by the trial court, any error was harmless beyond a reasonable doubt. Appellant's subsequent statements were simply continued denials of guilt consistent with his previous, unobjected-to statements and with his defense at trial; likewise, the officers' indication that Appellant had the victim's cell phone was cumulative of other evidence, including their statements earlier in the interview and testimony from the woman who gave the phone to the officers. See Cook v. State, 274 Ga. 891, 896

12

(4) (561 SE2d 407) (2002) ("[A]ny error in admitting the statements at issue must be deemed harmless because the statements were echoed by other independent evidence at trial." (citation omitted)).

(b) As to the second interview, "[w]here a defendant's right to remain silent has not been scrupulously honored, a [later] statement by the defendant will be deemed properly obtained only if the defendant himself initiates the communications with law enforcement authorities." Mack, 296 Ga. at 244 (2). Detective Sales testified at the Jackson-Denno hearing that after the first interview ended, Appellant was taken to a holding cell, given something to eat and drink, and allowed to use the bathroom. The detective testified that at some point later, Appellant said, "If you'll let me smoke a cigarette I'll talk some more." Appellant was then allowed to smoke a cigarette outside before he was taken back to the interview room, where the recording of the second interview began at 4:03 a.m. On cross-examination, Detective Sales testified that he could not remember the precise circumstances leading to Appellant's offering to talk more, explaining: "I don't know if I was going by the holding cell and I heard him mumbling or he asked something or if it was during the time that we were getting him the chips and drink." At the beginning of the second interview, the

13

officers again went over Appellant's <u>Miranda</u> rights, and he again signed a waiver of those rights. He was then questioned for about an hour.

The trial court did not err in admitting this interview, because the record supports the court's conclusion that it was initiated by Appellant. See <u>Mack</u>, 296 Ga. at 248 (2) (b) ("On appeal, the reviewing court must accept the trial court's findings of disputed fact regarding 'initiation' unless clearly erroneous. However, the court must review de novo the determination of whether the facts so found constitute an effective 'initiation' in the legal sense." (citations omitted)). Although Detective Sales could not remember the precise sequence of events leading to Appellant's offer to speak further about the case, the detective testified directly that Appellant was never questioned about the case in the holding cell and that Appellant initiated the additional discussion about the case. See <u>Mack</u>, 296 Ga. at 246 (2) (b) ("'[I]nitiation' requires not only that the defendant speak up first but also that his words reflect a desire to discuss the investigation at hand." (citation omitted)). Whether Appellant did so when Detective Sales was passing by his cell or was delivering food is immaterial.

Moreover, the trial court properly concluded that Appellant's initiation of further discussion about the case was not "the product of past police

14

interrogation conducted in violation of [his] previously invoked rights." Mack, 296 Ga. at 248 (2) (b). Even if we again assume that the officers violated Appellant's right to remain silent 58 minutes into the first interview, the final two minutes of that interview consisted mainly of Appellant's denying his involvement in the crimes while the officers asked about the victim's cell phone. When Appellant unequivocally said, "Man, I ain't got nothing else to say," the officers ended the interview. Appellant then made an unsolicited offer to talk more about the case during a two-hour break when he was left by himself in a holding cell. See Cheley v. State, 299 Ga. 88, 92 (786 SE2d 642) (2016) (holding that, after Cheley said he was "done talking" and was given a break to smoke, he initiated further questioning by telling officers during the break that he wanted to continue his statement). Compare Mack, 296 Ga. at 249 (2) (b) (concluding that Mack did not initiate his third interview where "Mack's request to speak with [the investigator] was made just minutes after the cessation of more than one-and-a-half hours of police questioning, conducted in violation of Mack's previously invoked right to remain silent, during which [the investigator] repeatedly implored, badgered, and cajoled Mack to tell the truth," all of which "followed the interrogation of the previous day, in which [the

15

investigator] had also blatantly ignored Mack's invocation of his Fifth Amendment privilege"). Accordingly, the trial court did not err in admitting Appellant's second custodial interview.

Judgment affirmed in part, reversed in part, and vacated in part, and case remanded for resentencing. All the Justices concur.


Decided February 27, 2017.

Murder. Crisp Superior Court. Before Judge Hughes.

David J. Walker, Katherine L. Dodd, for appellant.

Bradford L. Rigby, District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General, for appellee.