301 Ga. 852
FINAL COPY

S17A1024.  TANNER v. THE STATE.

HINES, Chief Justice.

Leshan Tremiele Tanner appeals his convictions for felony murder, conspiracy to commit robbery, and attempt to purchase marijuana all in connection with the fatal shooting of Cedric Huff.  He challenges the admission into evidence of statements by the victim to the victim's mother and the sufficiency of the evidence of his guilt. We find the challenges to be without merit; however, we vacate in part because of an error in sentencing.[1]

[1] The crimes occurred on June 5, 2014.  On September 23, 2014, a Hall County grand jury returned an indictment against Tanner and Rodnie Maurice Stokes a/k/a Rebel charging them jointly with Count 1 – felony murder while in the commission of robbery; Count 2 – felony murder while in the commission of conspiracy to commit robbery; Count 3 – felony murder while in the commission of attempt to purchase marijuana; Count 4 – robbery; Count 5 – conspiracy to commit robbery; and Count 6 – attempt to purchase marijuana.  Stokes was additionally charged with Count 7 – felony murder while in the commission of armed robbery; Count 8 – armed robbery; Count 9 – possession of a firearm during the commission of a felony; and Count 10 – possession of a firearm by a convicted felon.  Tanner filed a motion to sever which was granted. Tanner was tried before a jury September 14-17, 2015, and found guilty on Counts 2, 5, and 6; he was found not guilty of the remaining charges against him. On September 18, 2015, he was sentenced to life in prison for felony murder as charged in Count 2, and concurrent sentences of ten years in prison on Counts 5 and 6. A motion for new trial was filed on October 7, 2015, and supplemented by brief on May 6, 2016.  The motion for new trial, as supplemented, was denied on July 21, 2016.  A notice of appeal was filed on August 16, 2016, and the case was docketed to the April 2017 term of this Court.  The appeal was orally argued on June 26, 2017.

The evidence construed in favor of the verdicts showed the following. On the afternoon of June 5, 2014, a "loud smack" was heard coming from an apartment complex on West Avenue in Hall County. An African-American man was seen running out of an apartment building and entering a white truck before it took off down West Avenue. A second man, who was shirtless and carrying a colorful book bag, ran out of the same building and in the same direction as the truck. A man in yellow shorts with "red" on them walked out of the building and said he had been shot. Paramedics found this man, Cedric Huff, lying outside bleeding from an apparent gunshot wound. Huff was stabilized and taken to the hospital. When asked what happened, Huff said he did not know what happened or who was responsible. He would not give the police permission to enter his apartment even though he had his key with him in the ambulance. As a result, a search warrant for Huff's apartment was requested and executed.

Police saw overturned furniture and blood throughout Huff's apartment, suggesting a struggle occurred; but there were no signs of forced entry. Drug paraphernalia and varying amounts of marijuana were found. A total of three or four pounds of marijuana was found in the main bedroom, some of which was

2

packaged individually. Given the amount of drugs found in the apartment, investigators did not find Huff's evasiveness unusual. Although no money was found inside the apartment, $922 was found in Huff's shorts. Two cell phones were found inside the apartment and one outside.

Huff's girlfriend, Michelle Watson, saw Huff four to five times a week and spoke with him daily. She was aware that he sold marijuana. He customarily locked his door every time someone entered or exited, and would not give Watson a spare key to his home. Instead of calling 911, Huff called Watson after he was shot. Watson had seen Tanner at his job at Denny's several months before the shooting when Huff took him "some." Tanner and Huff had grown up together and had gone to the same high school.

Huff was in the hospital's intensive care unit for sixteen days, mostly in an unconscious state due to a medically-induced coma. However, at one point he awoke and had a conversation with his mother, Mary Huff, who was sitting by his side. She asked Huff if he knew who she was and where he was, and he replied, "yes, momma." She then asked him what happened, and "who did this" and he replied, "they robbed me." When asked who, he said "Leshan Tanner" twice and confirmed that Tanner worked at Denny's. He also mentioned

3

"Oakwood" and when asked who else was involved in the shooting, he replied "Little Monster." Huff's mother was unfamiliar with either Tanner or "Little Monster," but implored her son to tell someone the truth as to what happened. However, before he could do so, the forty-one-year-old Huff died on June 21, 2014. The cause of death was a single gunshot wound to the chest.

Tanner had vacated his Oakwood apartment on June 12, 2014, a week following the shooting, after receiving an eviction notice due to the nonpayment of three months' rent and related charges, which amounted to over two thousand dollars. On June 21, 2014, the police found a white truck matching the description of the one at the crime scene at a house where Tanner's girlfriend was known to sometimes stay. It was parked under a shrub behind several vehicles with its tag obscured from street view.

A search warrant was obtained for Tanner's parents' home, and although Tanner had previously told police that he did not have a cell phone, his phone was found in his mother's underwear drawer. Text messages and contacts were deleted from the phone, including those involving Huff and Tanner's co-indictee

4

Rodnie Maurice Stokes.[2] Police were able to retrieve these communications and pull the call log between Tanner and Stokes. The text messages indicated that Tanner and Stokes were involved in illegal business dealings, and cell phone records showed traffic between Tanner and Huff through May 2014, and at the beginning of June 2014. In fact, Tanner made contact with Huff two days before and on the day of the shooting, and there were contacts between Tanner and Stokes following the shooting. Investigators also discovered that, although Tanner did not have much of an Internet search history prior to June 5, 2014, afterwards he searched, inter alia, for the Gainesville Times, the Hall County Sheriff's Office, obituaries, and the FBI's "Most Wanted" list.

Tanner was interviewed twice by the police. In the first interview, he said that he went alone to Huff's place to buy his usual quarter ounce of marijuana; that he and Huff were the only ones there; that he did not have a cell phone and just "popped up" at Huff's home; and that Huff was "fine" when he left his apartment that day. In the second interview, Tanner's story changed

---

[2] Prior to trial, Stokes pled guilty to voluntary manslaughter, attempt to purchase marijuana, attempted armed robbery, and possession of a firearm during the commission of a felony and by a convicted felon. He gave a detailed proffer under oath about Tanner's role in the crimes, and described Tanner's involvement in the planning and execution of the robbery. He stated that Tanner fired the shot that killed Huff.

significantly. He said he went to Huff's residence with "Rebel," later identified as Stokes; that he had used his cell phone to speak to Huff to order a larger amount of marijuana than usual; that he used the same cell phone to communicate with Stokes before and after the encounter with Huff; and that he heard a shot while in Huff's home, but did not see any blood.

1. Tanner contends that the trial court committed reversible error in admitting Huff's hearsay statements pursuant to OCGA § 24-8-807 ("Rule 807")[3] because they were not sufficiently reliable and were far less probative than the testimony of eyewitness Stokes, whose testimony the State had procured but chose not to present.[4]

---

[3]OCGA § 24-8-807 provides:
     A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
         (1) The statement is offered as evidence of a material fact;
         (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
         (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.
However, a statement may not be admitted under this Code section unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

[4] Tanner maintains that the alleged error requires reversal of his convictions for felony murder and conspiracy to commit robbery. Tanner admitted his guilt of attempting to purchase marijuana. His defense to the remaining charges was that Stokes acted alone in the robbery and that

6

It is certainly true that the residual hearsay exception contained in Rule 807 was designed to be used very rarely and only in exceptional circumstances, and only when there exists certain exceptional guarantees of trustworthiness and high degrees of probativeness and necessity. *Smart v. State*, 299 Ga. 414, 421 (3) (788 SE2d 442) (2016). In this case, during trial but outside the presence of the jury, the State made a proffer of the pertinent, anticipated testimony of Huff's mother, and following the proffer and argument by counsel, the trial court permitted the testimony, finding that the requirements of Rule 807 were met.[5]

In the proffer, Ms. Huff testified that her son called her after he had been shot, and told her only that he had been shot and was at home; she was unable to further speak with her son until twelve days after his surgery because he was in a coma; when Huff awakened at the hospital, she was by his side; that Huff then told her what happened; and that she implored him to tell the truth or that

---

he had no idea that Stokes intended to rob Huff.

[5] The mother's testimony before the jury echoed the testimony she provided in the proffer.

she would do so.[6] Ms. Huff also testified that her son knew who she was in spite of having a fever; that she kept in touch with her son all of his life and lived around the corner from him; that they talked on a regular basis, with her son calling her every other day; and that her son had lived with her prior to moving into his home three years before his death.

Under Rule 807, a trial court's decision to admit hearsay evidence is reviewed for an abuse of its discretion. See *Rivers v. United States*, 777 F3d

[6] Ms. Huff testified, in relevant part:
> I said, you know, [t]ell me what happened. . . . He hesitated . . . he had just woken up and I wanted to make sure he knew where he was and who I was. I said, Baby, tell Momma what happened. You know, who did this to you? What happened? And he said, Momma, he say, they tried to rob me. I said, [r]ob you? I said, who is "they?" . . . And then he took his breath again, because he really couldn't say a whole lot of sentences. He was just saying words, you know, every time. I said, Tell me who was "they." And he said, Leshan Tanner. You know, that's the way he got it out. And I say, Leshan Tanner? I say, [d]o I know him? And he say, Denny's . . . I said, [y]ou mean he work at Denny's? He shook his head, responded yes. That still didn't ring a bell to me because, like I say, I didn't know the name. And then he said, Oakwood . . . And I say, [y]ou mean he live in Oakwood? And he said, [y]es. And I say, [y]ou said "they." Now, who else? And he just said, Little Monster. I hesitated again, too. Little Monster? You know, I didn't know anything about Little Monster. I guess he maybe didn't know the real name, and I'm just speaking for myself. He just said, Little Monster. So we stopped for a while because he was - his blood pressure and everything was up. He had a fever. I say, just take your time. You know, wait up for a minute. We stopped for a minute. We didn't say anything else, and I didn't ask him any other questions. And then a little time went by or so, and I went back over there to him again. I said, Cedric, I say, Now, you know you're going to have to tell what happened, what happened to you. Because, you know, it happened to you and you need to tell the truth. No matter how bad things seem, you need to get it out. He said, Momma, I will. I said, Cedric, you've got to promise me now you'll do the right thing and tell the truth. And he said he would. And I say, Well, I'll promise you this. If you don't tell it, I will. So we left it that day. (Punctuation omitted.)

8

1306, 1312 (II) (11th Cir. 2015). And as noted, Rule 807 applies only when there are "certain exceptional guarantees of trustworthiness." Such categories of hearsay have attributes of trustworthiness over and above that possessed by the general run of hearsay statements, and the hearsay is considered sufficiently trustworthy because of the circumstances under which the hearsay statements were originally made. *Smart v. State*, supra at 421-422 (3).

In this case, exceptional guarantees of trustworthiness were established. The evidence showed that although Huff was in serious condition and intermittently in a medically-induced coma during the period of his hospitalization, he was lucid and oriented at the time of his statements to his mother. Huff was urged, essentially ordered, by his mother, with whom it was established that he had a close relationship, to tell the truth about who shot him. And, while Huff may not have wanted his mother to know about his drug dealings, he then had no apparent reason to lie to her about the identities of the men who caused his mortal injury. Furthermore, the statements were consistent with other evidence of Tanner's involvement in the crimes. It was within the trial court's discretion to find that the statements were more probative on the identities of the perpetrators than any other evidence, including that from co-

9

indictee Stokes, as they were uttered by the victim himself who had no apparent bias or potential benefit in making such identifications; the testimony of accomplices in a felony prosecution, unlike that of victims, requires corroboration to sustain a conviction. OCGA § 24-14-8.[7] The totality of the circumstances in this case makes plain that the trial court did not abuse its discretion in admitting into evidence Huff's statements to his mother.

2. Tanner also contends that the admission of Huff's hearsay statements violated his rights under the Confrontation Clause as they were testimonial and thus prohibited. See *Crawford v. Washington*, 541 U. S. 36 (124 SCt 1354, 158 LE2d 177) (2004). He argues that Huff's mother's ongoing cooperation with the police and her "actively assisting" in the investigation made her essentially an agent of the police; therefore, the statements were testimonial in nature and it was harmful error to admit them.

"A statement is testimonial if its 'primary purpose . . . was to establish evidence that could be used in a future prosecution.'" (Citation omitted.)

---

[7] OCGA § 24-14-8 provides:
> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.

*Favors v. State*, 296 Ga. 842, 845 (2) (770 SE2d 855) (2015). Here, the circumstances of the victim's statements show that they were not made in order to assist in a future prosecution. Instead, the circumstances suggest that Huff was merely answering his mother's questions after days of unconsciousness, confiding in her unlike the evasive manner in which he spoke to the police immediately following the shooting. What is more, his mother's obvious distress at her son's condition and her imploring him to tell the truth support the conclusion that the mother was acting primarily as a concerned mother during the exchange with her son, rather than as an agent of the police. Here, Huff's statements to his mother concerning the shooting were non-testimonial.

3. Tanner further contends that the evidence was insufficient as a matter of law to support his convictions for conspiracy to commit robbery and felony murder based on conspiracy to commit robbery. He concedes that the evidence established that he and Stokes were partners in the attempt to purchase marijuana; but, he maintains that the case against him for conspiracy to commit robbery and felony murder was almost entirely circumstantial and that the only direct evidence of his guilt was the erroneously admitted hearsay statements from Huff. Citing *Harrington v. State*, 300 Ga. 574, 577-578 (2) (a) (797

SE2d 107) (2017), Tanner urges that given the weak circumstantial evidence of his participation in the robbery, it is "equally possible" that he was unaware of Stokes's intent to rob Huff; therefore, his convictions for conspiracy to commit robbery and felony murder are invalid as a matter of law.

To begin with, Huff's statements to his mother directly implicating Tanner in the attempted robbery resulting in the fatal shooting were not erroneously admitted into evidence. See Division 1, supra. However, regardless of the admissibility of such evidence, it, coupled with the other evidence of Tanner's culpability introduced by the State, belies a conclusion that it was "equally possible" that Tanner was unaware of Stokes's intent to rob Huff. Tanner admitted to being in Huff's apartment to buy marijuana during the time period when Huff was shot; although Tanner denied any affiliation with Stokes, phone evidence showed that he and Stokes spoke and texted numerous times leading up to Huff's demise; the evidence portrayed the likely scenario in which Huff let Tanner into his home, being a prior customer, Huff locked the door behind him as was his routine, and then Tanner unlocked the door to let in Stokes to commit the robbery when Huff went to get the requested large amount of marijuana from his bedroom; the physical evidence of a significant struggle

12

inside Huff's apartment further suggested that even if Tanner and Stokes did not anticipate killing Huff, it was a natural consequence of bringing a firearm to the robbery. Finally, Tanner's behavior after the crimes, e.g., his Internet search history, deletions from his phone, concealment of his phone and the vehicle viewed at the crime scene, and continued communications with Stokes, further support his conviction for felony murder predicated on conspiracy to commit robbery. Simply, the evidence was sufficient for a rational trier of fact to find Tanner guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

4. Although not raised by Tanner, the State concedes that inasmuch as Tanner was found guilty of and sentenced for felony murder while in the commission of conspiracy to commit robbery (Count 2), he could not also be sentenced for the underlying felony of conspiracy to commit robbery (Count 5). See footnote 1, supra. Because the crime of conspiracy to commit robbery merges into the felony murder predicated thereon, the trial court erred in sentencing Tanner on the conspiracy to commit robbery count. See OCGA § 16-1-7 (a) (1). Accordingly, Tanner's sentence on Count 5 is vacated. In all other

respects, we affirm.  See *Smith v. State*, 297 Ga. 667, 670 (3) (777 SE2d 453) (2015).

Judgment affirmed in part and vacated in part.  All the Justices concur.

Decided August 28, 2017.

Murder. Hall Superior Court. Before Judge Fuller.

Dawn M. Seibert, H. Bradford Morris, Jr., for appellant.

Lee Darragh, District Attorney, Juliet Aldridge, Laura K. Lukert, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth M. Haase, Assistant Attorney General, for appellee.